**The DENVER POST CORPORATION, d/b/a The Denver Post, Intervenor–Appellant,**

**and**

**Wayne Harris, Katherine Harris, Thomas Klebold, and Susan Klebold, Intervenors–Appellees,**

**v.**

**Russ COOK, in his capacity as Sheriff of Jefferson County, and Jefferson County Sheriff's Department, Defendants–Appellees.**

**No. 02CA1327.**

Colorado Court of Appeals,
Div. III.

Aug. 12, 2004.

Certiorari Granted Jan. 10, 2005.

Faegre & Benson, LLP, Thomas B. Kelley, Steven D. Zansberg, Eileen Kiernan–Johnson, Denver, Colorado, for Intervenor–Appellant.

Montgomery Kolodny Amatuzio, C. Michael Montgomery, Joel A. Kolodny, Steven G. Greenlee, Denver, Colorado, for Intervenors–Appellees Wayne Harris and Katherine Harris.

Patterson, Nuss & Seymour, P.C., Gregg E. Kay, Franklin D. Patterson, Brian C. Proffitt, Englewood, Colorado, for Interve-nors–Appellees Thomas Klebold and Susan Klebold.

William A. Tuthill, III, County Attorney, Susan Prose, Assistant County Attorney, Lily W. Oeffler, Assistant County Attorney for Defendants–Appellees.

Ken Salazar, Attorney General, Elizabeth H. McCann, Assistant Attorney General, Alan J. Gilbert, Solicitor General, Denver, Colorado, for Amicus Curiae Attorney General, State of Colorado.

Opinion by Judge ROY.

The Denver Post (the Post) appeals from the district court's order in favor of the Jefferson County Sheriff's Office (JCSO) finding that certain writings and tape recordings seized by law enforcement officers pursuant to search warrants are not "criminal justice records" and, therefore, are not subject to the Colorado Criminal Justice Records Act, § 24–72–301, et seq., C.R.S.2003 (CCJRA). We remand for further proceedings.

The events surrounding the Columbine High School tragedy are well known. On April 20, 1999, Eric Harris and Dylan Klebold entered Columbine High School heavily armed and with homemade explosive devices. They shot and killed twelve students and one teacher, injured numerous others, and ultimately killed themselves.

As relevant to this appeal, the JCSO began an investigation into the attack on that same day. After obtaining search warrants, deputy sheriffs entered and searched the Harris and Klebold (the families) homes. Among the items seized from the homes were videotapes, audio tapes, and written materials prepared by the boys prior to the attack (collectively the recordings).

In April 2000, family members of the student victims initiated this action against the JCSO seeking access under CCJRA to certain information it collected during its investigation. Other parties were allowed to intervene, but no one sought disclosure of the recordings.

In May 2000, the JCSO issued a Final Report announcing its conclusions. The

JCSO later returned to the families many of the items seized, however, it kept the recordings.

In January 2002, the Post intervened with a request to review the recordings. The trial court bifurcated the proceedings, to determine first whether the recordings were "criminal justice records" within the meaning of CCJRA, and second whether they should be disclosed to the public pursuant to CCJRA.

The trial court concluded that the recordings were not "criminal justice records" merely because the JCSO possessed them, that the specific items sought by the Post were not "criminal justice records," and, accordingly, that CCJRA did not govern their release and disclosure.

On January 29, 2004, we issued an opinion in which we held that the recordings were public records subject to CCJRA, but remanded the matter to the trial court for a determination of whether, on the date of the Post's request, the JCSO was holding the recordings "for use in the exercise of functions required or authorized by law or administrative rule" under § 24–72–302(4), C.R.S. 2003. The Post filed a petition for rehearing, arguing that we were incorrect in concluding that the recordings were criminal justice records only for so long as they were held for the purposes enunciated by CCJRA. We requested that defendants file a response to that petition.

Upon consideration of the original briefs, the petition for rehearing, and the response to that petition, we withdraw the prior opinion but again remand the case to the trial court for further proceedings.

I.

At the outset, we note that, with exceptions not applicable here, property seized by law enforcement officials remains the property of its owner prior to the seizure. *See People v. Angerstein,* 194 Colo. 376, 572 P.2d 479 (1977); *People v. Buggs,* 631 P.2d 1200 (Colo.App.1981).

It is clear that the recordings are not, and never have been, the property of the JCSO. As to the Klebolds, this issue was previously determined in *Klebold v. Search & Seizures,* (Colo.App. No. 01CA1240, 2002 WL 31033085, May 16, 2002)(not published pursuant to C.A.R. 35(f)), in which the family requested the return of tapes and documents, some or all of which are the subject of this proceeding. The JCSO disclaims ownership of the recordings.

II.

We next address whether the recordings are "criminal justice records" under CCJRA. We conclude that they are not. We further conclude, however, that they are public records, the disclosure of which is governed by the Colorado Open Records Act, § 24–72–101, et seq., C.R.S.2003 (CORA).

Our review of a trial court's interpretation of a statute is de novo. *Rowell v. Clifford,* 976 P.2d 363 (Colo.App.1998). The primary task of a court in construing a statute is to give effect to the intent of the General Assembly. Courts must look primarily to the language of the statute and determine the legislative intent by giving effect to the commonly accepted meaning of the words. Only if the statutory text is ambiguous should a court employ alternative means to determine legislative intent. *Reg'l Transp. Dist. v. Voss,* 890 P.2d 663 (Colo.1995). Such aids of construction include other statutory provisions, including laws on the same or similar subjects; consequences of a particular construction; and legislative declarations of purpose. Section 2–4–203, C.R.S.2003. Further, statutes should be interpreted, if possible, to harmonize and give meaning to other potentially conflicting statutes, *People in Interest of D.L.E.,* 645 P.2d 271 (Colo. 1982), and to give consistent, harmonious, and sensible effect to all their parts. *In re Marriage of Davisson,* 797 P.2d 809 (Colo. App.1990).

CCJRA is a part of CORA and addresses a particular subset of records maintained by law enforcement, or criminal justice, agencies. The purpose of CCJRA is stated as follows: "The General Assembly hereby finds and declares that the maintenance, access and dissemination, completeness, accuracy, and sealing of criminal justice records are

matters of statewide concern and that, in defining and regulating those areas, only statewide standards in a state statute are workable." Section 24–72–301(1), C.R.S. 2003. Further, the public policy underlying CCJRA is "that criminal justice agencies shall maintain records of official actions ... and that such records shall be open to inspection by any person and to challenge by any person in interest." Section 24–72–301(2), C.R.S.2003.

The term "criminal justice records" is defined broadly as "all books, papers, cards, photographs, tapes, recordings, or other documentary materials, regardless of form or characteristics, that are made, maintained, or kept by any criminal justice agency in the state for use in the exercise of functions required or authorized by law or administrative rule." Section 24–72–302(4), C.R.S.2003. However, other words and phrases used to describe categories of criminal justice records narrow the application of CCJRA. For example, "official action" means "an arrest; indictment; charging by information; disposition; pretrial or posttrial release from custody; judicial determination of mental or physical condition; decision to grant, order, or terminate probation, parole, or participation in correctional or rehabilitative programs; and any decision to formally discipline, reclassify, or relocate any person under criminal sentence." Section 24–72–302(7), C.R.S.2003. "Arrest and criminal records information" means:

information reporting the arrest, indictment, or other formal filing of criminal charges against a person; the identity of the criminal justice agency taking such official action relative to an accused person; the date and place that such official action was taken relative to an accused person; the name, birth date, last-known address, and sex of an accused person; the nature of the charges brought or the offenses alleged against an accused person; and one or more dispositions relating to the charges brought against an accused person.

Section 24–72–302(1), C.R.S.2003.

Further, CCJRA does not define or use "records of investigations," "investigative files or records," or any similar term.

Like CCJRA, CORA also broadly defines the general category of files and records of public agencies to which it applies. The term "public records" is defined in § 24–72–202(6)(a)(I), C.R.S.2003, as follows:

all writings made, maintained, or kept by the state, any agency, institution, a nonprofit corporation incorporated pursuant to section 23–5–121(2), C.R.S. [corporations formed by various public entities to hold and develop scientific and technological discoveries], or political subdivision of the state, or that are described in section 29–1–902, C.R.S. [local government-financed entity], and held by any local government-financed entity for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds.

CORA indirectly defines those public entities keeping and maintaining public records in the definition of "official custodian," which is:

any officer or employee of the state, of any agency, institution, or political subdivision of the state, or of any local government-financed entity who is responsible for the maintenance, care, and keeping of public records, regardless of whether the records are in his or her actual personal custody and control.

Section 24–72–202(2), C.R.S.2003. A sheriff's office is certainly a public entity under that definition.

Significantly, however, CORA addresses, and limits access to, records of investigations performed by sheriffs' offices and other criminal investigatory entities. Section 24–72–204(2)(a), C.R.S.2003, states, in pertinent part:

The custodian may deny the right of inspection of the following records, unless otherwise provided by law, on the ground that disclosure to the applicant would be contrary to the public interest:

(I) *Any records of the investigations conducted by any sheriff*, prosecuting attorney, or police department, any records of the intelligence information or security procedures of any sheriff, prosecuting at-

torney, or police department, or *any investigatory files compiled for any other law enforcement purpose.*

(Emphasis added.)

CORA excludes from its definition of "public records," among other things, "criminal justice records." Section 24–72–202(6)(b)(I), C.R.S.2003. This exclusion of "criminal justice records" dates to the adoption of CCJRA. Colo. Sess. Laws 1977, ch. 340, §§ 1, 2. The provision of CORA relating to investigative records dates to the adoption of CORA. Colo. Sess. Laws 1968, ch. 66, §. 4. The amendment of CORA excluding "criminal justice records," while still leaving untouched the provision in CORA relating to investigative files, is some indication that investigative files are not included in "criminal justice records."

Further, CORA also limits disclosure of many other categories of information held by public agencies for the benefit of the agency. These limitations include, among others: (1) test questions and scoring keys; (2) details of research projects; (3) real estate appraisals; and (4) market analysis data. Section 24–72–204(2)(a)(II)–(V), C.R.S.2003.

More significantly, unlike CCJRA, CORA recognizes privacy interests of private parties in public records by prohibiting disclosure of some information to anyone other than the "person in interest." Section 24–72–204(3), C.R.S.2003. This prohibition includes, by way of example: (1) medical and mental health information; (2) personnel files; (3) letters of reference; (4) trade secrets, privileged information, and confidential commercial or financial information; (5) student telephone and address information; and (6) records protected by a common law governmental or deliberative process privilege. Section 24–72–204(3)(a)(I)–(IV), (VI), (XIII), C.R.S.2003. A " '[p]erson in interest' means and includes the person who is the subject of a record or any representative designated by said person; except that, if the subject of the record is under legal disability, [it] means and includes his parent or duly appointed legal representative." Section 24–72–202(4), C.R.S.2003. Exemptions from disclosure are to be narrowly construed. *Freedom Newspapers, Inc. v. Tollefson,* 961 P.2d 1150 (Colo.

App.1998). This recognition of privacy interests is further support for the proposition that highly personal and confidential information, regardless of ownership, may become a "public record" within the meaning. of CORA. In addition, our supreme court, in dicta, has recognized that a constitutional right to privacy may likewise limit the disclosure of public records. *Wick Communications Co. v. Montrose Bd. of County Comm'rs,* 81 P.3d 360, 365 n. 4 (Colo.2003); *see also In re Bd. of County Comm'rs,* 95 P.3d 593 (Colo.App. 2003)(*cert. granted* July 26, 2004).

Therefore, we conclude that the disclosure of the recordings is not governed by CCJRA, but rather by CORA, if they are "public records."

### · III.

We next address the issue of whether the recordings are "public records" under CORA.

Whether any document or article. of property is, or is a part of, a "public record" depends on whether it is "made, maintained or kept" by the state or a political subdivision of the state. Section 24–72–202(6)(a)(I); *see Wick Communications Co. v. Montrose Bd. of County Commr's, supra.*

The JCSO maintains that the terms in the phrase "made, maintained or kept" are active terms, that is, they require more than mere storage or possession. The terms require, in the JCSO's view, that the public entity, to use analogous words, must have created, updated, or actively maintained the records. *See Int'l Bhd. of Elec. Workers Local 68 v. Denver Metro. Major League Baseball Stadium Dist.,* 880 P.2d 160, 165 (Colo.App. 1994)(CORA does "not necessarily provide for release of information merely because it is in the possession of the· government"). The Post asserts that passive possession is sufficient for a document or article of personal property to become a "public record" or part of a "public record." That is, according to the Post, storage or possession is sufficient. *See Wick Communications Co. v. Montrose Bd. of County Comm'rs, supra,* 81 P.3d at 366 (while "made" and "maintained"

were interpreted as active terms, "kept" was given a passive meaning, as in "he kept his diary locked and in his possession"); *Int'l Bhd. of Elec. Workers Local 68 v. Denver Metro. Major League Baseball Stadium Dist., supra* (confidential financial information contained in bid related documents was a public record). We do not believe that the issue of whether the recordings are "public records" can be resolved based on this dichotomy.

*Wick Communications, supra,* involved the question of whether the diary of a public official was a public record subject to disclosure under CORA. There, after dismissing the airport manager, a county manager used, and quoted from, the diary in preparing his report to the county commissioners concerning the dismissal. A news organization sought disclosure of the complete diary, asserting that it was a public record subject to disclosure pursuant to CORA by virtue of its use by the county manager.

In *Wick Communications,* the supreme court "adopted" the three-part test applicable to the federal Freedom of Information Act (FOIA) as the appropriate analysis under CORA, that is, whether the agency (1) improperly (2) withheld (3) a public record. The court concluded that if the county manager possessed the diary in his official capacity, the diary was a public record subject to CORA. The court then concluded, under the unique circumstances there presented, that a person requesting disclosure of a private document held by a public official in his or her official capacity has the initial obligation to present evidence that the document is likely a public record subject to disclosure. The court further concluded that the news organization had failed to fulfill this initial evidentiary obligation to show that the diary *was made, maintained, or kept* by a public entity because the diary (1) was made by the county manager in his private capacity, (2) was not maintained by the county, and (3) was not kept by the county or by the county manager in his official capacity. *See also In re Bd. of County Comm'rs, supra* (private e-mails between county officials on a publicly-owned computer system may be public records).

Here, there is no dispute that the recordings are the private property of the families and that the JCSO holds them in its official capacity. There is also no dispute that the recordings were lawfully acquired and were used by the JCSO in the normal course of its investigation of the Columbine tragedy. Portions of the "basement tapes" were used in the preparation of the sheriff's final report and in the sentencing hearing of the individual convicted of providing weapons to the boys. In addition, while the recordings may be severable from the rest of the investigative files, we conclude that that they have become a part of the investigative records "made, maintained, or kept" by the JCSO.

While there are certainly parallels between the recordings and diaries the boys might have wished to keep private, there are also parallels between them and a self-aggrandizing manifesto the boys might have wished, even ached, to be made public.

We conclude that the recordings are public records subject to the disclosure requirements and limitations of CORA. The matter must be remanded to the trial court to determine, among other things, whether the recordings are exempt from disclosure pursuant to § 24–72–204(3)(a); whether disclosure of the recordings is contrary to the public interest pursuant to § 24–72–204(2), C.R.S. 2003; and such other matters as may be asserted by the parties affecting whether the recordings should be publicly disclosed.

Therefore, the case is remanded to the trial court for further proceedings consistent with the views herein expressed.

MARQUEZ and HUME *, JJ., concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2003.